---

## THE HERO.[*]

*(District Court, E. D. Pennsylvania. March 23, 1881.)*

1. CHARTER-PARTY—OBTAINING SIGNATURE BY FRAUD—BROKER WHEN AGENT OF ONE PARTY ALONE.

F., a ship-broker in New York, sent to H., a ship-broker in Philadelphia, the name of a vessel open to charter in case H. could obtain any proposals. H. obtained an offer from P. W. & Sons, which was accepted. The charter was drawn in P. W. & Sons' office, and marked by the employe in charge of their chartering department with his initials, which, according to a system adopted by P. W. & Sons, and known to H., indicated to P. W. & Sons that the charter was correct and might be signed without further examination. The charter was forwarded to F., who, after altering it by an interlineation, signed it and returned it to H., who left it at the office of P. W. & Sons without mentioning the alteration. P. W. & Sons signed it without noticing the alteration, and sent it to H., but shortly afterwards, discovering the fraud, rescinded the contract. *Held*, that H. was not the agent of P. W. & Sons, but of the ship, and that P. W. & Sons were not liable on their charter-party.

Libel by the master of the bark Hero against Peter Wright & Sons to recover damages for an alleged breach of charter-party. The testimony disclosed the following facts: Funch, Edye & Co., ship-brokers of New York, sent to Hoffman & Meyer, ship-brokers of Philadelphia, the name of the bark Hero (then at Cartagena) as a vessel open to charter in case Hoffman & Meyer could obtain any proposals. Hoffman & Meyer obtained an offer from Peter Wright & Sons, of Philadelphia, which was accepted. The charter was then drawn by a clerk in the employ of Peter Wright & Sons and sub-

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

mitted to W. W. Young, who had charge of their chartering department. It set forth that the bark was "now at Cartagena, and to proceed *promptly* to Philadelphia." Mr. Young examined the charter, and, finding it correct, wrote on it his initials, which, according to the system adopted by Peter Wright & Sons, and known to at least one member of the firm of Hoffman & Meyer, indicated that the charter was in accordance with the previous agreement, and might be signed by the firm without further examination. It was then sent to Hoffman & Meyer, who took it in person to New York. Funch, Edye & Co. objected to the words "proceed promptly," and desired to insert the words "to-wit, in about a fortnight." Hoffman & Meyer objected to this, and returned to Philadelphia without the charter, leaving the matter unsettled. The next day Funch, Edye & Co., having communicated with the master by cable, telegraphed Hoffman & Meyer that the proposed alteration must be made, and requesting them to see Peter Wright & Sons. Hoffman & Meyer, without complying with this request, telegraphed Funch, Edye & Co. that Peter Wright & Sons would cancel the charter if altered, and to send it unchanged. Notwithstanding this, Funch, Edye & Co. interlined the words "to-wit, in about a fortnight," and forwarded the charter thus altered to Hoffman & Meyer. One of the latter firm, with notice of the alteration, took the charter to the office of Peter Wright & Sons, and asked for Mr. Young. The clerk told him that Mr. Young was absent, and asked on what business he called. Upon being told that he had the charter-party of the Hero, the clerk asked him to leave it, which he did without mentioning the alteration. The clerk sent it to one of the firm of Peter Wright & Sons, (Mr. Neall,) who, seeing Mr. Young's initials, and not noticing the alteration, signed it, and it was then returned to Hoffman & Meyer, who forwarded it to Funch, Edye & Co. A few days later, Peter Wright & Sons, upon receiving copies of the charter, discovered the alteration, and notified Funch Edye & Co. that they would not carry out the charter unless the interlined words were erased. This Funch, Edye & Co. refused to do. Upon the arrival of the bark, Peter Wright &

Sons refusing to load her, she was obliged to obtain a charter at a lower rate, and this libel was filed to recover damages.

*Edward F. Pugh* and *Henry Flanders*, for libellant.

*H. G. Ward* and *Morton P. Henry*, for respondents.

BUTLER, D. J. That fraud was practiced in obtaining the respondents' name to the charter, is clear. Hoffman & Meyer were distinctly informed, while negotiating, that the prompt sailing of the vessel from Cartagena was an essential requisite to the contract. With this in mind, the terms were agreed upon, and reduced to writing, with a clear understanding that the paper should be signed as written. Mr. Young, consequently, with the knowledge of Mr. Hoffman, marked the paper as examined and ready for the respondents' signature. Mr. Hoffman testifies that he understood Mr. Young's mark; that it was a sign the paper had been examined, "so that Mr. Neall, or any other member of the firm, could sign, without reading it through; that the sign was on the paper when it was received, and sent to New York. He further testifies that he and Mr. Meyer objected, earnestly, to the alteration which Funch, Edye & Co. proposed to make; that Funch, Edye & Co. had agreed to sign the charter-party as prepared, without alteration. Hoffman & Meyer telegraphed to Funch, Edye & Co. "Don't alter,—vessel to sail promptly,—as Wrights will surely object to the same." And again, "Wrights insist to have charter to-day. They will cancel charter if you alter it, therefore post at once, unchanged, to avoid trouble." In short, Hoffman & Meyer knew that the paper expressed the definite agreement of the parties, and was to be signed as written; that Peter Wright & Sons would agree to nothing else, but would withdraw from the transaction if any alteration was made; and that when the paper should be returned, with Mr. Young's sign of examination and approval upon it, they would sign it without reading. After the alteration had been fully resolved upon and made, by Funch, Edye & Co., they requested Hoffman & Meyer to communicate with respondents about it; and were answered by Hoffman & Meyer that Mr. Neall had been seen and his consent obtained, "after a short struggle." This answer was wholly untrue.

Not a word was said to Mr. Neall, or any one connected with the respondents, on the subject. The paper was .taken to their place by Meyer, without any allusion being made to the alteration, and Mr. Neall, seeing the examination mark of Mr. Young, signed it at once, without reading, as Hoffman & Meyer knew he would. Thus it plainly appears that a fraud was practiced in obtaining the respondents' name, and that Hoffman & Meyer practiced it.

Upon whom should the consequences fall? If Hoffman & Meyer were the respondents' agents, or were not the libellant's, the latter must not suffer for their unfaithfulness. Whom did Hoffman & Meyer represent? Mr. Young, whose duty, as an employe of the respondents, it is to charter vessels, says, "Hoffman & Meyer called and asked for a bid for the 'Hero;'" that "Peter Wright & Sons did not ask Hoffman & Meyer to procure them tonnage;" but that the latter asked the former to make a bid for the vessel, and they did so. Mr. Neall says "the vessel was brought to the attention of Peter Wright & Sons by Hoffman & Meyer, who advised us they had the vessel from Funch, Edye & Co." It is thus rendered quite plain, (for there is no contradiction of this testimony,) that the respondents did not employ Hoffman & Meyer, or regard them as interested in their behalf. Mr. Meyer, who was called as a witness by the libellant, (and would seem to be interested in sustaining the charter,) says "Funch, Edye & Co. gave us, Hoffman & Meyer, the 'Hero' to get a charter-party for, in this city. We then applied to Peter Wright & Sons for an offer, and had several interviews with them, the substance of which we communicated to our principals, Funch, Edye & Co., before an understanding was reached." This corresponds with the testimony of Messrs. Young and Neall, to the extent they go. It reaches further, however, and proves, if believed, not only that they were not the agents of Peter Wright & Sons, but were the agents of the *ship*. The testimony of Meyer is corroborated by the correspondence between Funch, Edye & Co. and Hoffman & Meyer,—the letters and telegrams, most, if not all, of which contain evidence that Hoffman & Meyer represented

the ship, under Funch, Edye & Co. The latter telegraphed the former, during the negotiation, close "Russian bark 'Hero,' now at Cartagena, six shillings and three pence, Cork orders, usual charter," and received for reply, "We cannot get that rate, but can get six shillings, with privilege of continent." August 27th, they wrote to Hoffman & Meyer "We authorize you to close the vessel and expect charter-party in the morning." After receiving the paper and resolving to alter it, they telegraphed, Hoffman & Meyer, "We must insert in 'Hero's' charter, vessel to sail in about fortnight. Please see Wrights at once." On forwarding the paper to Hoffman & Meyer, with the alteration, they expressed the hope that the latter would be able to obtain Wright's assent to the change. Hoffman & Meyer, in communicating the fact that Wright's signature had been obtained, congratulated themselves and Funch, Edye & Co. on their success in the transaction, saying, "We have been very lucky to get this vessel through and charter signed."

These communications, of themselves, would seem to leave no room for doubt that Hoffman & Meyer were acting in behalf of the vessel, alone, and that Funch, Edye & Co., as well as themselves, so understood. The only evidence to the contrary is that found in the testimony of Mr. Volckens, of the firm of Funch, Edye & Co., who says they did not place the vessel with Hoffman & Meyer for charter, but that the latter gentlemen, as agents for Peter Wright & Sons, applied to them to take freight, and that they simply closed with the offers made by Peter Wright & Sons, through such agents. The testimony of this witness (who, no doubt, intends to be entirely fair), shows, in my judgment, a strong bias in favor of the libellant. He seems to be especially on his guard, throughout, against any form of expression or answer, tending to show concert between his firm and Hoffman & Meyer, repeating with unnecessary frequency the idea that Funch, Edye & Co. simply accepted the offer of Hoffman & Meyer as representatives of Peter Wright & Sons. He also seems forgetful of Hoffman & Meyer's remonstrances respecting the alteration of the paper, and their representations of Wright's

unwillingness to allow it; while the correspondence shows how earnest these remonstrances were, and how fully his firm was informed on this subject. I would not say anything disparaging of the witness, personally. I do not doubt his honesty. That he should desire to sustain the charter is quite natural. His firm indicated its views on this subject very clearly when notified of the respondents' repudiation of the paper, and again when conveying this notification to the libellant. I cannot regard the testimony of this witness as sufficient to overcome, or even shake, the case made out on the other side, opposed as it is, not only by what the other witnesses, who speak on the subject, say, but also by the plain import of the correspondence of his own firm with Hoffman & Meyer. I regard it as clear that Hoffman & Meyer had charge of the interests of the ship, alone, in their transaction with Peter Wright & Sons; and that all parties so understood at the time. They are *ship*-brokers, (as distinguished from freight-brokers,) and belong to a class who, as Mr. Neall testifies, ordinarily represent the ship alone; and look to it for compensation. Here the compensation of Hoffman & Meyer comes from the ship; they have no claim, and pretend to none, from the respondents. Their entire duty was to the ship, for which they were bound to obtain the best bargain they could honestly procure. Unfortunately they overstepped the line, and resorted to fraud. The libellant must therefore bear the consequences. A contract thus obtained, through the agency of those to whom the ship was entrusted for charter, cannot be enforced. No question can arise respecting the importance of the change made in the paper. Funch, Edye & Co. pronounced it to be of the highest importance, and it is shown that Peter Wright & Sons viewed it in the same light. But aside from this consideration, a party must be allowed to make his own contract, and cannot be held to one obtained from him through fraud. Whether it is as favorable to him, as one he might have been willing to make, cannot be inquired into.

I have not overlooked the rule, in considering this case, that brokers must sometimes be treated as agents of both

parties,—invoked by the libellant. The doctrine has no application here. Whether it would avail the libellant if it had, need not be considered.

It is much to be regretted that Funch, Edye & Co. did not immediately communicate Peter Wright & Sons' repudiation of the paper, to the libellant, on receiving notice of the fact. The ship had not then sailed, and no serious loss would have resulted, had this been done. The position they assumed,—that their agency closed with the signing of the charter,—rests on a very contracted view of their duty,—the adoption of which they may yet, possibly, have occasion to regret.

The libel must be dismissed, with costs.