KEYSER v. BLUE STAR S. S. CO., Limited.

(Circuit Court of Appeals, Fifth Circuit.   January 3, 1899.)

No. 683.

1. ADMIRALTY JURISDICTION—ACTION FOR BREACH OF PROVISION OF CHARTER PARTY.

Where a provision of a charter party for a foreign vessel, though not in itself maritime in character, is so connected with the other stipulations therein as to render it an essential part of the contract, and it appears probable that without it the contract would not have been entered into by the owners, a court of admiralty has jurisdiction of an action for an alleged breach of such provision.

2. SHIPPING—ACTION ON CHARTER PARTY—PLEADING.

In an action by the owners of a foreign vessel against a charterer to recover for an alleged overcharge in a draft for expense money advanced the master in the port of loading, under a clause of the charter party requiring such advances "at current rate of exchange," an answer alleging that the charge made was in accordance with an established custom of the port, in regard to such drafts and the rate of exchange thereon, states a defense, and is not subject to exception for insufficiency; the current rate of exchange as expressed being always a matter of proof.

3. SAME—AUTHORITY OF MASTER UNDER CHARTER PARTY—SETTLEMENT OF ACCOUNTS.

Where, by a provision of a charter party for a foreign vessel to be loaded at a port in this country, the charterer was required to advance expense money to the master at the port of loading, for which the master should give drafts on the owners, and the contract further provided that any dispute thereunder should be settled at the port where it arose, the master was thereby authorized to make settlement with the charterer for advances; and such settlement, in the absence of fraud or mistake, was binding on the owners.

Appeal from the District Court of the United States for the Northern District of Florida.

For opinion in district court, see 81 Fed. 507.

John C. Avery, for appellant.

J. Parker Kirlin and John Eagan, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and PARLANGE, District Judge.

McCORMICK, Circuit Judge.   The Blue Star Steamship Company, Limited, filed its libel in personam against W. S. Keyser, charging that the steamship company had chartered its steamship to Keyser to load at Pensacola, from the charterer, a cargo of timber to be taken to Manchester, for an agreed freight.   Among other provisions of the charter are these:

"(7) Sufficient cash for ship's disbursements at port of loading, to be advanced the master by charterers or their agents, at current rate of exchange, subject to 2½ per cent. commissions; master to give his draft at thirty days' sight on owners to cover same, which owners agree to accept on presentation, and to protect, ship lost or not lost. * * * (17) The vessel to be consigned to charterers or their agents at port of loading, paying them 2½ per cent. address commissions on amount of freight earned. * * * (20) Any dispute under this charter shall be settled at port where it arises: the custom of each port to be observed in all cases where not specially expressed."

The libel charges that:

"At the port of loading, divers advances were made by the charterers for the ship's disbursements, and the charterers presented to the master for signature a draft upon libelant at thirty days' sight, for the sum of £1,440. 13s. 4d. sterling, which sum the charterers represented, and the master believed, to be the amount of the advances for disbursements and other sums due from the libelant to the charterers, in accordance with the provisions of the charter party, at the current rate of exchange; and the master thereupon signed the said draft, and delivered it to the charterers."

It also charges that the current rate of exchange at the time and place the draft was drawn was $4.83 per pound sterling; that the draft was indorsed and transferred by the charterers, and paid thereafter by the libelant; that the amount of advances for disbursements, and of other sums, was not £1,440. 13s. 4d., but was only £1,415. 7s. 0d.; that, to make the amount of the draft, the charterers added 2½ per cent. upon the address commission of £101. 7s., reckoned exchange at $4.75, instead of $4.83, and included $.61 as commission on the difference between those rates; that the difference so paid to the charterers by the master's draft is $123.21, for which the suit was brought.

The original answer denies that the current rate of exchange contemplated by the parties was $4.83 to the pound sterling, and alleges that the draft was given for the correct amount, saving a slight clerical error; that the address commission of 2½ per cent. was payable at the port of loading, and paid by including it in the master's draft as a disbursement of the ship, which was legal, and in accordance with the custom of merchants at Pensacola. The answer further alleges that the charterers took the master's draft on the owners at 30 days' sight, for the ship's bill, payable to the master's order, and indorsed by him, "reckoning $4.75 as the equivalent at Pensacola of one pound of the draft," and that this was done,

—"because such was the current rate of such exchange at Pensacola at the time, and that for more than twenty years article 7 of the said charter party—or substantially the same—had been used in charters of foreign vessels, numbering several hundred each year, to take timber and lumber from Pensacola to foreign countries, and has, by a uniform and general usage and custom of the trade, been taken and applied as meaning that the charterer should advance money to the ship as required while in port, and, upon settling up with the charterer preparatory to clearing, the master should give the charterer his draft payable to his order, signed and indorsed by him, upon his ship's owners or the buyers of the cargo, for all moneys previously advanced or those payable by the ship, at the rate of exchange at which such drafts were currently taken by charterers of such vessels under such charters at Pensacola; that the expression 'at current rate of exchange,' found in said article of the charter, has never been regarded in the trade as meaning a premium or a discount for replacing a sum of money at Pensacola by an equal sum in the country of the owners of the chartered vessel, or vice versa; except by means of master's drafts on their shipowners or buyers of the cargo; and, indeed, it is impossible that such should be the meaning at Pensacola, as almost if not all of the foreign trade of the port is in timber and lumber by chartered foreign vessels, with reference to which business foreign exchanges are almost exclusively made, and made by means of master's drafts payable to their own order, and signed and indorsed by them, on the owners of their vessels or buyers of the cargo, as aforesaid, which are given and received, as aforesaid, at the rate at the time current, and, there being no market for them at Pensacola, they are sent on for collection."

As a further defense, the answer states that the master was well advised of each and every item in the account at the time he gave the draft to pay it, and understood the rate of exchange at which it was given, and gave it without protest, objection, or dispute.

This answer was orally excepted to, and the exception was argued, and an order was made sustaining the exception and granting leave to amend the answer.

On June 19, 1897, the respondent amended his answer as follows:

"The respondent, not abandoning, but insisting upon, his former answer, amends the same by adding thereto the following allegations: That respondent is advised that the several matters and things charged in the said libel constitute no cause of action within the admiralty and maritime jurisdiction of this honorable court; that the said draft was presented by the respondent to the master of the steamship, and the same was signed by the master in the respondent's office in the city of Pensacola, and that the libelant, at the time of the making of the charter party, had knowledge of the custom, and made the charter party with reference thereto; that the libelant had knowledge of the fact that exchange had been computed and reckoned at the rate of $4.75 to the pound sterling in the transaction between the respondent and the master of the steamship, and that the draft was drawn accordingly, and, having such knowledge, paid the draft without protest or objection; that after paying the draft, and after having knowledge of the fact that the amount for which the sum was drawn was fixed by computing the pound sterling at $4.75, the libelant communicated to the respondent no complaint or objection until about one year thereafter."

To this amendment the libelant, on the 29th of September, 1897, excepted:

"(1) On the ground that the answer as amended is not sufficient in law; (2) on each of the grounds stated in the exceptions to the respondent's former answer, which are hereby separately repeated and insisted upon; (3) on the ground that the hearing of exceptions to the original answer was a trial of the cause, and that in the absence of error or surprise in such trial, and since there neither appears nor is alleged surprise or newly-discovered evidence or any reason why the facts stated in the amendment should not have been stated in the original answer, such amendments should not be regarded; (4) to such part of the amendments as alleges 'that the draft was presented by the respondent to the master of the steamship, and the same was signed by the master in the respondent's office in the city of Pensacola,' on the ground that it appears by the pleadings that the master had no authority to vary the terms of the charter party, or to waive the payment of any of the chartered hire therein stipulated, and that the respondent had notice thereof, and that said allegations are immaterial and insufficient; (5) to so much of said amendments as alleges 'that the libelant, at the time of the making of the charter party, had knowledge of the custom, and made the charter party with reference thereto.' on the ground that knowledge of the custom cannot affect the meaning of the terms of the charter party in relation to the rate at which the drafts should be drawn, which are unambiguous, and that the allegations are immaterial and insufficient; (6) to such part of the amendments as alleges that the libelant had knowledge of the rate at which exchange was reckoned and the draft drawn, and, with such knowledge, paid such draft without objection, on the ground that it appears that by the charter party the libelant was bound, and that apart from the charter party it would have had a right, to pay the draft, and that it did not thereby waive its claim to the unpaid balance of charter hire, and that, therefore, such part of the amendments is immaterial and insufficient; (7) to such part of the amendments as alleges that after paying the draft, with knowledge of the method of computing the same, 'the libelant communicated to the respondent no objection or complaint until about one year thereafter,' on the ground that the same is immaterial and insufficient."

Thereafter, on the 15th day of January, 1898, the cause coming on to be heard upon the libel, answer, and amendments thereto, and the exceptions to the amended answer, and after argument of proctors for the respective parties, upon consideration the court ordered and adjudged that the exceptions to the amended answer "be, and the same are hereby, sustained."

And afterwards, on the 17th day of January, 1898, the respondent further amended his answer in words and figures as follows:

"The master of said steamship was well aware of each and every item of the account at the time he gave the draft, and the rate of exchange at which the same was given, and that such rate was less than the current rate of exchange at Pensacola at which sterling was convertible into American money, and that the rate was in accordance with the custom aforesaid, and that he paid the same voluntarily; that the libelant was well aware, when it paid the draft, of the rate of exchange at which the same was given, and that such rate was less than the current rate of exchange at Pensacola at which sterling was convertible into American money, and that the rate used was in accordance with the custom aforesaid; and it paid the draft voluntarily."

To the answer as thus amended, the libelant, on the same day, submitted exceptions, on the following grounds:

"(1) On the ground that the answer as amended is not sufficient in law; (2) on each of the grounds stated in the exceptions filed on September 29, 1897; (3) that the matters therein alleged and set forth are immaterial and insufficient."

Afterwards, on the 8th of February, 1898, the cause having been submitted on the exceptions, a final decree was made by the court, and entered upon the following day, which is in words and figures as follows, to wit:

"This cause coming on to be heard upon the libel, answer, and amendments thereto, and the exceptions to the amendment to answer, filed January 17, 1898, and being submitted to the court by the proctors for the respective parties, upon consideration it is ordered and adjudged by the court that said exceptions to said amendment to answer be, and the same are hereby, sustained. And the proctor for the respondent having announced that no further answer or amendment thereto would be filed by him, or that leave to amend same was desired, it is therefore ordered, adjudged, and decreed that the libelant, the Blue Star Steamship Company, Limited, a corporation organized and existing under the laws of the kingdom of Great Britain and Ireland, do have and recover of and from William S. Keyser, trading as W. S. Keyser & Company, the sum of one hundred and twenty-three and twenty-one one-hundredths dollars, together with interest on the same from the 7th day of April, 1896, being the date of the filing of the libel herein, and the costs, taxed in the sum of $46, and that said libelant do have execution therefor."

From this decree the respondent appeals, and assigns errors, which his proctor has grouped under four heads:

"(1) The case is not one of admiralty and maritime jurisdiction. (2) The custom at Pensacola, as alleged in the answer, defeats the action. (3) The giving of the draft by the master, with knowledge of the facts, voluntarily and without protest, defeats the action. (4) The payment of the draft by the libelant, with knowledge of the facts, without protest or objection, defeats the action."

In the opinion of a majority of this court, the first ground of error, as grouped by the appellant's proctor, is not well taken. The question it presents is not without difficulty, and many of the adjudged cases tend to support the appellant's contention. Such precedents, spring-

ing originally from the jealousy of the English common-law courts in the matter of admiralty jurisdiction, and their effort to limit the same, have somewhat, especially in the earlier cases, affected decisions in this country. While exact precedents may not exist which directly support the jurisdiction of this case, it seems to us that the analogies of the better considered of the American cases, and the manifest trend of decisions in this country, do support it. The answer shows that almost if not all of the foreign trade at the port of Pensacola is in timber and lumber, by chartered foreign vessels, with reference to which business foreign exchanges are almost exclusively made, and made by means of master's drafts payable to their own order, and signed and indorsed by them, on the owners of their vessels or buyers of the cargo, which are given and received at the rate at the time current; and, there being no market for them at Pensacola, they are sent on for collection. Such being the case, it may very well be that the libelant would have refused to charter the ship except upon the condition that the charterer would make and agree to observe stipulation 7, as expressed in the charter party. It is true that the mere fact of this agreement being embraced in the charter party would not of itself give it the character of a maritime contract; but its relation to the other stipulations of the charter party may be such (and, we think, appears to be such) as to connect it with the contract into which the parties were entering,—a contract of an undisputed maritime character,—and in such a manner as to authorize the parties to apply to a court of admiralty to inquire into any alleged breaches of this stipulation 7. Insurance Co. v. Dunham, 11 Wall. 1–36; Ben. Adm. §§ 257–262, 287, and cases there cited.

It is not necessary to consider the other grounds separately. We think the custom at Pensacola was well pleaded; and the district court should have heard proof in support of that part of the answer. The terms "at current rate of exchange" do not express $4.83 any more than they express $4.75. What is the current rate of exchange at a given time between two given places is a matter of proof, and can be made certain only by proof. So true is this that a draft drawn payable in a certain sum, "with current rate of exchange," is not negotiable because of the uncertainty as to the amount expressed. The draft on the owners of the vessel made by the master, payable to his own order, indorsed by him, and delivered to the respondent, cannot be classed strictly as bankers' exchange. And such a draft, made and uttered at a port where there is no general market for such paper, is, of necessity, subject to the particular conditions existing at that port affecting such paper. Whether, therefore, the respondent may or may not rely upon the general custom, it seems to us that he can plead these particular conditions, as he has done in his answer. And, if supported by the proof, the manner and rate of discount of such paper current at that time in the port of discharge and loading, where it had to be used, would meet the language as used in paragraph 7 of the charter party. Waiving any question as to the general authority of the master to settle the accounts of the ship in the manner that it was done in this case, and to bind the owners of the vessel by his settlements, it seems to us that the language of the paragraph in question ex-

pressly authorized and required the master to make the settlement, and that, in the absence of fraud or mistake of fact, the settlements made by him would bind the owners. In other words, if made under such circumstances and conditions as to be binding on him if he was dealing on his own behalf, it would be binding on them. And this view is strengthened by the provision contained in paragraph 20, that "any dispute under this charter party shall be settled at port where it arises." Therefore we do not deem it necessary to consider, or at least to express, any view as to the effect which the payment of the draft by the owners, with full knowledge of the facts, without protest or objection, would have on this action. We conclude that the answer of the respondent does present matters that will, if established by the proof, defeat the plaintiff's action, and that the court erred in sustaining the exceptions to the answer. Ben. Adm. § 290; 2 Pars. Shipp. & Adm. 7; Wait, Act. & Def. 476, 478.

We therefore conclude that the district court erred in sustaining the plaintiff's exceptions to so much of the answer of the respondent as showed the manner of taking, receiving, and using such drafts as the one given by the master in this case, and as is shown and relied upon as conclusive of the action of the master with reference to the settlement with the respondent, as evidenced by its bill rendered and his draft in satisfaction thereof. And it is now ordered that the decree appealed from be reversed, and the cause remanded, with instructions to award the respondent a new trial, and to overrule the exceptions to the answer on the merits.