PATAGONIA S. S. CO., Ltd., v. GANS S. S. LINE.

(Circuit Court of Appeals, Second Circuit. June 6, 1917.)

No. 240.

1. SHIPPING ☞49(2)—CHARTER—RIGHT OF CHARTERER TO USE DECK SPACE.
    A vessel was chartered to carry a full cargo of heavy grain at a stated rate of freight per quarter. The charterer was given the use of all holds and covered deck space where cargo is ordinarily carried, but no provision was made for a deck load. The charterer was also given the right to load

a full cargo of other merchandise by paying a total freight equal to what it would amount to on a full cargo of heavy grain. The charterer loaded a cargo of general merchandise for other shippers and paid the agreed rate of freight on the dead weight capacity of the ship, but it also loaded an open deck cargo of lumber. *Held*, that the owner was entitled to recover the reasonable value of the use of the deck space, which had not been contracted for, in addition to the charter hire, not measured however by the bill of lading freight received by the charterer, which was not a trustee for the owner in respect to such freight nor a wrongdoer, the lumber having been taken by the master without objection, nor by the market rate of freight, since the owner was without right to use such space or hire it to others than the charterer.

2. SHIPPING ⬤➡58(2)—CHARTER—OMISSION OF PROVISIONS THROUGH MISTAKE.

A court of admiralty may permit a charterer to show, in defense to a suit by the owner for extra freight on deck cargo, that by the agreement it was to have the use of such space, but that the provision was inadvertently omitted from the charter party.

3. SHIPPING ⬤➡39—CHARTER—CONCLUSIVENESS OF CHARTER PARTY.

A charter party as executed, in the absence of fraud or mutual mistake, determines the rights of the parties, and neither the master nor other agent of the owner has authority to alter or waive its provisions.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Patagonia Steamship Company, Limited, against the Gans Steamship Line. Decree for libelant, and respondent appeals. Modified and affirmed.

Haight, Sandford & Smith, of New York City (John W. Griffin, of New York City, of counsel), for appellant.

Convers & Kirlin and Kirlin, Woolsey & Hickox, all of New York City (Charles R. Hickox and Cletus Keating, both of New York City, of counsel), for appellee.

Before COXE, WARD, and ROGERS, Circuit Judges.

WARD, Circuit Judge. [1] March 6, 1912, the libelant, the Patagonia Steamship Company, Limited, chartered its steamer Patagonia to the Gans Line to carry a full cargo of heavy grain from New Orleans to Rotterdam at 3s. 3d. a quarter. The charter contained a clause familiarly known as the dreading clause, the material part of which was as follows:

"4. The charterers have the further privilege of shipping, full cargo of other lawful merchandise, in lieu of a like quantity of grain, in which case the charterers are to appoint the stevedores to load and to discharge the cargo, under master's supervision, paying all loading and discharging expenses, but charterers to be in no way liable for improper stowage, the owners paying them the expenses, including bag hire, figured at current rate of the port, which the vessel would have incurred loading and discharging a full cargo of heavy grain, and total freight to be equal to what it would amount to on a full cargo of heavy grain."

The charterer availed itself of this privilege, and, instead of a cargo of heavy grain, shipped a cargo of general merchandise belonging to various shippers. The space appropriated to cargo was defined in article 11:

"11. The charterers to have full reach of the holds, including peaks, and all covered deck spaces where cargo is ordinarily carried, the same as if vessel loaded for owners' account."

The charterer, however, loaded 836 tons of lumber on the open deck, for which the consignees paid bill of lading freight in the sum of £695. 12s. 9d.

The freight on the dead weight capacity of the vessel was £5,915, and this sum the charterer paid to the owner, but refused to pay any additional freight on the deck load, and the owner filed this libel to recover a reasonable freight therefor, plus the reasonable cost of lashing the lumber.

Nothing whatever having been said in the prior negotiations between the agents of the parties about a deck load, the owner's agents prepared and submitted to the charterer's agent a charter party which contained a clause permitting a deck load:

"20. If safe and legal deck load may be given, at merchant's risk."

[2] The agents of the charterer not being satisfied with one of the clauses, according to them the consignment clause, and according to the owner's agents, the dreading clause, submitted a different form of charter party containing no privilege to load on deck, which was duly executed. About a week later the charterer's agents observed that there was no such clause and pointed this out to the owner's agents, who, they say, replied that there would be no trouble because it was understood and agreed that the steamer should carry deck cargo. If this were the agreement, a court of admiralty, even if it could not reform the charter in a direct proceeding on the ground of mutual mistake (Williams v. Insurance Co. [D. C.] 56 Fed. 159), would doubtless admit such an equitable defense (The Hero [D. C.] 6 Fed. 526; U. S. v. Cornell Steamboat Co., 202 U. S. 184, 194, 26 Sup. Ct. 648, 50 L. Ed. 987). But Judge Learned Hand has found that there was no such understanding, in which we concur with him, and therefore the owner's agents could not alter the charter in this respect after it was executed.

[3] The charterer further contends that the owners are estopped from making this claim because the master, before the steamer sailed from New Orleans, indorsed on the charter party, "All conditions of the within charter have been complied with at New Orleans," and drew a draft in favor of the charterers for the difference between the bill of lading freight and the freight payable on the dead weight capacity of the steamer. As in the case of the agents, the master had no authority to alter the contract made by the charter party. The charter party as executed, in the absence of fraud, which is not suggested, or of mutual mistake, which has been found not to exist, determines the rights of the parties.

The charter party contained a cesser clause as follows:

"Charterers' liability to cease on cargo being shipped and difference of freight and for demurrage, if any, paid, vessel having a lien on the cargo for freight."

The owner was obliged to collect all the bill of lading freight in order to cover the charter money due it and pay the master's draft drawn at New Orleans in favor of the charterer. Freight on the deck load as between it and the charterer was neither ascertained nor provided for in the charter party, and the owner was not given a lien upon it to secure whatever claim it might have. Therefore the cesser clause does not apply.

Finally, the charterer says that the court should not permit the owner's claim because it is inequitable. It contends that the owner has received full freight for the dead weight capacity of the vessel and the deck load imposed no additional burden upon it. But a charterer has no right to load on deck unless the charter gives him the privilege (Carver on Carriage by Sea, § 262), and no such privilege was given in this case. It could not acquire the right to load on deck because it had paid freight for the full dead weight capacity of the vessel, all of which it did not use, even with the deck load included. No court can alter anything in or add anything to a contract because it thinks to do so would be reasonable. The assumption of such an authority would dangerously invade the rights of contracting parties.

The charterer, having used a part of the vessel to which it had no right, must pay the owner for it. This leads us to inquire how the compensation is to be measured. The charterer in this case cannot be regarded as a wrongdoer because the master did not refuse to receive the lumber on deck; he taking the position that, while the charter did not allow a deck load, the owner could sue the charterer for compensation. For the same reason the charterer cannot be regarded as a trustee for the owner in respect to the freight collected from the consignees. The libel recognized these propositions by asking to recover a reasonable freight, and by so doing waived any objections it might have had to the loading of cargo on deck.

We do not think The Port Adelaide (D. C.) 59 Fed. 172, in point. There the charterer was entitled to the whole vessel. Nevertheless the owner without the knowledge or consent of himself or his agents took on cargo in an adventure on his own account and deviated from the voyage. This plainly made him accountable as trustee, at the option of the charterer, for all the freight earned.

In the present case, the charterer contends that it should pay only the reasonable value of the use of the deck. That value cannot be the market rate of freight which the owner could recover by putting the space in the market, because it was not entitled either to use the space itself or hire it to others. The charterer was the only person in the world the owner could deal with. It had already paid for the voyage in the lump freight on the vessel's dead weight capacity. What the owner should receive for this deck space which could have been used by no one else is certainly not the market rate of freight, nor what this favored person could collect from others. The evidence is not specific upon this point, but the highest estimate in the record is £200, and this with interest plus $70, the expense of lashing the lumber, is what the charterer should pay. So modified, the decree is affirmed, with interest and costs of this court to the appellant.