### A. O. ANDERSEN & CO., Inc., v. TEXAS CO.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

#### No. 24.

**1. Shipping ⊂=37—Statement by owner held not representation, but expression of opinion as to rules subject to which charter was made.**

Where the chartered owner of a vessel, in executing a charter, inserted clauses requiring the charterers to sign and abide by the British bunker rules, its statement in a letter and circular, in response to a question concerning such rules, that the principal point in connection with the carrying of oil cargoes was that they should not be consigned to order, but only to concerns who were not enemies of Great Britain, was not a representation, but a mere expression of opinion as to what it regarded as the principal point.

**2. Contracts ⊂=25—Whether paper is contract or agreement to contract depends on whether everything agreed on is embodied.**

The test for determining whether a paper is a contract or only an agreement to make a contract is whether there is embodied in the paper everything which the parties have agreed to do, assuming that the other necessary elements of the contract exist.

**3. Contracts ⊂=25—Not preliminary agreement, rather than contract, because partly executory.**

That a contract is executory in some of its requirements and details does not render it a preliminary agreement, rather than a complete contract.

**4. Contracts ⊂=6—May be partly executed and partly executory.**

A contract may be partly executed and partly executory, or executory as to one party and executed as to the other.

⊂=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Shipping ☜37—Proposed charter, requiring approval by British authorities and signing of bunker rules by charterers, held a complete charter, and broken by failure to sign.**

A proposed charter, on which was stamped provisions making it subject to approval by the British authorities, and not binding on owners until notice of such approval, and providing that the charterers must sign and abide by the British bunker rules before it would become effective, was a charter party, and not an agreement to make one, and bound the charterers to sign such rules, and was broken by their failure to do so.

**6. Shipping ☜37—Tender to charterers, who did not sign British bunker rules as agreed, held not necessary.**

Where a charter required the charterer to sign and abide by the British bunker rules, and the facts surrounding a delay while the owner was urging the charterer to sign, and the owner's effort to induce it to sign the rules, showed that the vessel would have been at the charterer's disposal, if it had carried out its obligation to sign the rules, a useless tender was not required.

Hough, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by A. O. Andersen & Co., Inc., against the Texas Company. From a final decree dismissing the libel, the libelant appeals. Reversed, with instructions.

The libel was for the alleged breach of a charter party under which the steamship Rimfaxe was chartered by libelant (referred to infra at times as Andersen & Co.) to respondent (referred to infra at times as Texas Co.) for a voyage with case oil from Port Arthur, Tex., to five West Indian points, one of which was Paramaribo. Libelant was the chartered owner of the vessel, and in November, 1916, at a time when the United States was a neutral power, it proposed to charter her to respondent upon certain terms.

Davis, the superintendent of the shipping division of the export department of Texas Co., informed Dearborn, of D. B. Dearborn & Co., steamship brokers and agents, that Texas Co. "wanted a boat for the West Indies, about 30,000 cases." About November 9th Dearborn sent to Davis a copy of a letter written by Andersen & Co. to Dearborn's firm. The substance of the letter was an offering to Dearborn & Co. of the Rimfaxe on certain terms. This led to negotiations, the result of which was that Dearborn & Co. drew a proposed charter on November 21st, and apparently on that date Dearborn & Co. sent this proposed charter to Andersen & Co. for signature.

The proposed charter, which was on a printed form of Texas Co. and dated November 21st, contained all of the provisions and details necessary for the purposes of Texas Co. This paper was received by Dearborn & Co. from Andersen & Co. and signed by the latter, but with two clauses stamped on the side of the charter party, which had been added by Andersen & Co. and read as follows:

(1) "This charter is signed subject to the approval of charter and charterers by the British authorities, and this charter is not effective and does not become binding on owners until charterers have been notified in writing that the above approvals have been obtained."

(2) "Charterers must sign and abide by the British bunker rules before this charter becomes effective."

Dearborn sent this paper immediately over to Texas Company, and Davis inquired of Dearborn what the British bunker regulations were. Thereupon Dearborn called up some one connected with Andersen & Co. Dearborn was not sure whether he spoke to Hitching (vice president of Andersen & Co.) or to his assistant, Dormand. As Dearborn was anxious to have the charter party concluded, he asked, according to his testimony, that Andersen & Co. send him these bunker rules, and late that afternoon Andersen & Co. sent a circu-

lar to Dearborn, which Dearborn glanced over hurriedly and thereupon sent immediately to Texas Co.

There is some question (not however, important) as to the contents of this circular, but it will be assumed that all which the circular referred to was the fact that petroleum products should not be consigned to order nor to enemies of Great Britain. In any event, Andersen & Co., on the same day that the circular was sent, wrote a letter to Dearborn, dated November 28th, which read as follows:

"Referring to charter concluded through you with the Texas Oil Company on the steamship Rimfaxe, the present is to advise that, provided charterers comply with British bunker rules, said charter is effective. The principal point in regard to those bunker rules in connection with carrying of oil cargoes is that no oil or its products shall be consigned to order, same to be only on straight consignment to concerns that are not enemies of Great Britain or her Allies."

A copy of this letter was passed on to Texas Co. by Dearborn, and Texas Co., finding the letter satisfactory, signed the charter party, presumably on November 28th or 29th, and, under date of November 29th, Texas Co. wrote Andersen & Co.:

"Referring to the charter party which we made with you on the steamship Rimfaxe, through D. B. Dearborn & Co., particularly to the clause relating to the British bunker rules: We wish to advise that any shipments which we will make by this vessel will be consigned to our agents."

In the charter, dated November 21st, it appeared that the Rimfaxe was on passage to Ensanado (De Mora), Cuba. The vessel left that port for Port Arthur, Tex., on December 8th, for the purpose of carrying out the terms of the charter party and arrived at Port Arthur, Tex., on the morning of December 14th. About the time of the vessel's arrival, or shortly before, Andersen & Co. applied to the British consul for approval of the voyage, and was then informed, for the first time, that Texas Co. had not signed the British bunker rules. Andersen & Co. had signed these rules on May 17, 1916, and, under these rules, Andersen & Co. was required to charter its vessel only to those who had signed or would sign the rules. The penalty for violation of these rules was very serious, in that the offending shipowner was liable to be placed on the British Admiralty blacklist, and could not thereafter bunker any of its vessels at British or Allied ports.

On learning that the Texas Co. had not signed the rules, libelant took the matter up immediately with Texas Co., through Dearborn & Co. and also notified the master of the vessel not to commence loading until further notice. Apparently then, for the first time, Texas Co. took up for consideration the obligation of the British rules. Delay followed, although Hitching was insisting "all day long," right up to the time the vessel was ordered away, that the Texas Co. should sign the rules. Finally, under date of December 19th, Andersen & Co. wrote Dearborn that it would not hold the vessel open later than 2 p. m. that day for the decision of Texas Co. As the result of further correspondence and conversation, the matter was held open until 5 p. m. on December 20th, and the vessel was then ordered to Newport News in ballast, and there took on a less profitable cargo.

According to witnesses on its behalf, Texas Co., during the period between December 14th and December 20th, was carefully considering whether or not it would sign the British bunker rules, and in that connection sent its vice president to Washington to confer with the Department of State. No notice or information in this regard was given to Andersen & Co. and the result was the departure of the vessel from Port Arthur, as stated supra.

Duncan & Mount, of New York City (John A. McManus and Thomas J. Healy, both of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for appellee.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above).    At the base of the case is the question whether the paper, dated November 21st, was in fact a charter party, or merely an agreement for a charter party, or neither.    Preliminary to that question is the inquiry as to whether the Texas Co. was induced to sign the paper by false representations on the part of libelant.

The contention as to the false representation rests upon the contents of the circular and of the letter dated November 28th.    We shall assume for the purposes of this case that the defense which brings up this point is permissible in an action in admiralty.    Patagonia S. S. Co. v. Gans S. S. Line, 243 Fed. 532, 156 C. C. A. 230.    Cf. Anderson v. S. S. Kalfarli (C. C. A.) 277 Fed. 391, decided November 16, 1921.

[1] The testimony as to the contents of the circular is not at all clear, but we shall assume that the circular contained only what in substance was set forth in the letter of Andersen & Co., per Dormand, to Dearborn & Co., dated November 28th.    There does not seem to have been the slightest motive for libelant to have made any false representation.    Libelant undoubtedly was thinking, and quite naturally, of Texas Co. as an oil dealer and carrier of oil cargoes, and thus the letter of libelant stated what it regarded as "the principal point * * * in connection with carrying of oil cargoes."    This was in no sense a representation.    It was nothing more than an expression of opinion.    Libelant may have been entirely mistaken, and this may not have been "the principal point"; but whether it was or not is immaterial.    The mere fact that libelant referred to "the principal point" was and should have been an indication, at that time, to business men of ordinary experience in that class of business, that there were other provisions besides the one emphasized by libelant.    We are of opinion, therefore, that the question is really not whether the representation was false, but whether there was any representation in the legal sense, as distinguished from a mere expression of opinion, and we hold that all that the letter and the circular amounted to was that they embodied the opinion of Andersen & Co. as to what, quite naturally, Andersen & Co. regarded as "the principal point" in which Texas Co. would be interested.    See 13 C. J. 384, 385, for collation of many cases.

[2, 3] The question, then, is whether or not the paper was a charter party.    It is very difficult at times to determine upon which side of the line of demarcation between a contract and an agreement to make a contract a particular paper is to be placed.    Williston on Contracts, § 28 et seq.    In the last analysis, however, the reliable test is whether within the paper there is embodied everything which the parties have agreed to do, assuming in that hypothesis, of course, that the other necessary elements of a contract exist.    13 C. J. 237.    The contract itself may be executory in some of its requirements and details, but that fact does not detract from the character of completeness which gives to the paper its name and substance as a contract, as distinguished from a preliminary agreement.    Farrington v. Tennessee, 95 U. S. 679, 683, 24 L. Ed. 558.

[4] A contract may be partly executed and partly executory, and may be executory as to one party and executed as to the other.    Howe

v. Howe & Owen Ball Bearing Co., 154 Fed. 820, 83 C. C. A. 536; Galbreath Gas Co. v. Lindsey, 62 Okl. 84, 161 Pac. 826; 13 C. J. 245, 246.

[5] In the case at bar, stamped clause (1), supra, indicates clearly that the charter would not be "binding on owners" until they were notified that the approval of the British authorities had been obtained. Clause (2) here under consideration must be construed to the same effect. Plainly what the parties intended was that, as one of the terms of the contract, Texas Co. must sign the rules. If it complied with its agreement so to do, the contract then, ex proprio vigore, bound Andersen & Co. There was nothing further for Andersen & Co. to do, or which it could do, to bind Texas Co., or, if so disposed, to evade the contract. So far as concerns Andersen & Co., in respect of clause (2), it had no control over the contract after it and Texas Co. signed the paper dated November 21st with this clause incorporated.

In principle, the case is somewhat analogous with Orr v. Doubleday, Page & Co., 223 N. Y. 334, 119 N. E. 552, 1 A. L. R. 338. There the tenant had an option of renewal. It was held that the exercise of the option renewed the lease, that the acts of the tenant alone were required, and that any act of the landlord was unnecessary. So here the charter party might be paraphrased, in effect, as follows:

"We have agreed upon all the terms. Andersen herewith charters the vessel to Texas Co. for an agreed compensation, and, as a part of our mutual arrangements, Texas Co. must sign the British bunker rules, and, failing so to do, Andersen will not be bound; but if Texas Co. does what it has agreed to do, as part of the contract, then Andersen is automatically bound."

In The Tribune, 24 Fed. Cas. 191, No. 14,171, the master signed the following:

"I hereby agree, within three days, to be ready at Hampden, with a new suit of sails on the Tribune, to load for T. W. Letson [the libelant], and proceed without delay to Lubec, to take in what may be wanted to constitute her cargo, and proceed to Havana, and back to any port of the United States; also that the charter party shall not commence until she is loaded at Lubec, provided I am not detained over seven days in loading said vessel."

Below the foregoing, Letson signed:

"I agree to allow said vessel, on said charter party, five hundred Spanish dollars per month. The charter to be made at Lubec. Bangor, Nov. 23, 1836."

Mr. Justice Story held this to be a charter party, and, in addition to disposing of the particular question before him, he discussed the underlying principles. It is sufficient to quote the following as applicable to the case at bar:

"The making of a mere formal instrument under such circumstances may be treated rather as a farther assurance than as the inception of a maritime charter party. Nor is this doctrine at all new, even at the common law. It is not uncommon for agreements to be made for a lease for years, with suitable covenants for the due execution of a future formal lease; and in many cases of this sort, notwithstanding such covenants for a formal lease, the agreement has been held to amount to a present demise, where it seemed better adapted to carry into full effect the intention of the parties. Without going at large into the cases, it is sufficient to cite on this very point the case of Warman v. Faithfull, 5 Barn. & Adol. 1042, where it was established that an agreement for a lease for a definite period, for a fixed rent, amounted to a

present demise, notwithstanding a more formal instrument was to be executed, upon the intelligible ground that it best carried into effect the apparent intention of the parties. Upon a similar ground, I think the present instrument might well be construed to amount to a charter party for the voyage, loose indeed, and informal, notwithstanding a more formal instrument of the same nature was contemplated. * . * * "

Though, of course, the facts in The Tribune and in the case at bar are different, the principle upon which each case rests is essentially the same, and, in some respects, the case at bar is, perhaps, stronger than The Tribune. Here the precise acts which each party was to perform were set forth in the charter party, and the rights and obligations of each required no further nor complementary writing nor agreement between the parties. See also American Hawaiian S. S. Co. v. Willfuehr et al. (D. C.) 274 Fed. 214; Maury & Co. v. Culliford & Clark (C. C.) 10 Fed. 388; The Alberto (C. C.) 24 Fed. 379; Keyser v. Blue Star S. S. Co., Ltd., 91 Fed. 267, 33 C. C. A. 496.

Concluding, then, that the writing under discussion was a charter party, no question arises as to the right of Texas Co. to determine whether or not it would sign the British bunker rules. Having agreed, according to our construction, to sign these rules, it was, of course, bound to do so as part of its obligation under the charter party, and when it failed so to do, after the expiration of a reasonable time (November 28th or 29th to December 20th), it was guilty of a breach.

We think the other questions raised by appellee were properly disposed of by the District Court. In respect of the assertion that the vessel could not have sailed to Paramaribo, it is enough to refer to the testimony of the master that he showed to the Texas Co. representative a cablegram from his owner giving him authority to go to Paramaribo, and there is no doubt that the master would have loaded and sailed, if libelant had ordered him so to do.

[6] Further, in the circumstances, there was no need of an useless tender; and all the facts surrounding the delay at Port Arthur and the effort urging Texas Co. to sign the rules point to the conclusion that the vessel would have been at the disposal of Texas Co. as agreed, if Texas Co. had carried out its obligation to sign the British bunker rules. The case thus becomes one for damages for breach of charter party.

The decree is reversed, with costs, and the District Court is instructed to enter an appropriate interlocutory decree in favor of libelant in accordance with this opinion.

HOUGH, Circuit Judge (dissenting). If the paper writing sued on herein be construed as in the foregoing opinion, viz. as a positive engagement that Texas Co. would sign the bunker rules, all the rest follows easily enough.

The word "effective" is, however, of plain meaning, signifying by universal definition something producing the intended effect or result, something operative and efficacious. The agreement (whatever it be properly called) was in express terms not to become "effective" until charterer signed the rules. It seems to me that no meaning can be given such words, except by holding that there was nothing efficacious as a written contract, until those rules were signed by the charterer.

The suit is on a charter party; it is not for damages for failure to complete a charter party. As I believe there never was a charter party, the result reached below seems to me correct.