PETROLEUM RESEARCH CORPORATION v. BARNSDALL REFINING CORP.

No. 29488. July 2, 1940.

Rehearing Denied Oct. 8, 1940.

*105 P. 2d 1047.*

Louis W. Pratt, A. B. Honnold, and F. C. Swindell, all of Tulsa, for plaintiff in error.

M. D. Kirk, Gentry Lee, and W. M. Fleetwood, Jr., all of Tulsa, for defendant in error.

BAYLESS, C. J. This is an appeal from the district court of Tulsa county. Petroleum Research Corporation, a corporation, sued Barnsdall Refining Corporation, a corporation, "for the cancellation and rescission of a written contract" between the parties.

The following epitomized history of the relations between the parties, as gathered from the evidence and statements in the briefs, will serve to an understanding of the controversy. Prior to January 16, 1937, there apparently had been some experiments and negotiations between the parties by virtue of which Research was attempting to induce Barnsdall to use a patented process owned or controlled by Research for the treating of gasoline. On that date the parties executed a writing that is the basis of this action wherein the parties detailed the duties and obligations assumed by each. We will go more into detail respecting this writing later. Barnsdall made certain preliminary tests, and stopped pending the reconstruction of a portion of its refinery, after which it was to conduct further experiments on a commercial scale. After the reconditioning had been completed, but before anything

further could be done, fire rendered the refinery useless and it was necessary to make repairs. These were completed sometime late in December, 1937, or in January, 1938. However, on January 22, 1938 (we quote Research's brief), "the plaintiff withdrew and revoked the offer contained in the contract by reason of the defendant's alleged failure to accept and comply with the terms thereof," and shortly thereafter filed this action.

We quote parts of the writing and summarize other parts. For our convenience we have numbered the grammatical paragraphs of the writing from 1 to 20, and we believe this will not result in confusion, although these numbers do not correspond with certain numberings of the parties. Our numbers appear in parentheses.

No. 1 is the preliminary recital paragraph wherein the parties are identified.

"(2) WHEREAS first party represents that it controls a certain process for treating gasoline to remove gum therefrom and to sweeten the same, and represents that it has full rights under United States patent No. 1,801,213, on said process, and has the right to authorize other persons to use the same; and,

"(3) WHEREAS the first party recognizes that the testing of said process for its commercial value and usefulness will be a distinct contribution to its development and sale, and that the party testing same should receive remuneration therefor; and

"(4) WHEREAS the parties desire that second party shall make a test of said process at second party's refinery at Barnsdall, Oklahoma, and if the tests, in the opinion of second party, justify it, second party shall, for the purpose of finally testing the feasibility, usefulness and value of said process commercially, connect one of second party's Towers to the new and reconditioned Cross Cracking Plant to be erected and installed by second party at its said refinery at Barnsdall, Oklahoma; and,

"(5) WHEREAS after said tests, if second party decides that said treating process is valuable commercially and desires to use the same in its refinery opera-

tions, second party shall be permitted to use the same free from the payment of royalty or other charge, to the extent hereinafter stated, and all upon the terms and conditions hereinafter set forth:

"(6) NOW, THEREFORE, in consideration of the premises and in consideration of the mutual covenants and agreements herein contained, to be kept and performed, IT IS AGREED BY THE PARTIES AS FOLLOWS:

"(7) 1. Second party shall install upon its present Cross Cracking Still at its refinery at Barnsdall, Oklahoma, a small experimental apparatus for the purpose of testing the aforesaid treating process.

"(8) 2. If the results of said test, in the judgment of second party, justify the same, second party shall, for the purpose of finally testing the feasibility, usefulness and value of said process commercially, connect one of second party's Towers to the new and reconditioned Cross Cracking Plant to be erected and installed by second party at its said refinery at Barnsdall, Oklahoma.

"(9) 3. After the aforesaid final testing operations have been concluded, if the second party determines that the aforesaid treating process is valuable commercially, and if second party desires to use said process and second party shall thereupon be permitted to use and have the right to use the said process at any of its refineries now or hereafter in existence so long as is hereinafter specified. * * *"

The remainder of paragraph 9 contains the details respecting the quantities of oil that may be treated royalty free; and this is followed by paragraph number 10, wherein the parties illustrate by examples the method of calculating royalty upon the basis prescribed in the preceding paragraph. Paragraph 11 relates to the minimum liability for deficiency payments under the previous calculations; and then provides for forfeiture for nonuse, and the conditions upon which the commercial use thereof may be later terminated by notice. Paragraph 12 provides for monthly reports for the computation and adjustment of accounts. Paragraph 13 provides that Barnsdall shall bear the expense of the equipment for the tests, and that Research shall furnish the treating materials, for the testing operations. Paragraph 14 names the representatives of the respective parties for the performance and observation of the tests. Paragraph 15 relates to the use of the information and data developed by the tests. Paragraph 16 permits Barnsdall the use of any improvements on the process. Paragraph 17 contains the warranty of Research respecting its ownership of the process to be used, and its agreement to bear the expense of litigation over charges of infringement. Paragraph 18 governs the terms of royalty and free royalty in the event Research licenses the use of the process to other parties. Paragraph 19 contains certain definitions. Paragraph 20 provides that the agreement shall be binding upon the successors and assigns of the parties.

Research argues five propositions: I, The court erred in construing the agreement as an offer which was accepted by defendant and supported by mutual agreements and part performance; II, and in refusing to recognize the agreement as an option with a strict time limit for acceptance; and V, the contract, considered as anything but an offer or proposal, is void as unilateral and without consideration. III and IV deal with the issue of the admissibility of any evidence and the demurrer of Research to the answer. The view we take of I, II, and V will render it unnecessary to discuss these two at great length.

Complying with Research's request the trial judge made findings, part of which we quote:

"The court concludes that there has been an offer and an acceptance of the contract in this case;

"That there has been a substantial compliance on the part of the defendant with the contract which it undertook with the plaintiff.

"The court finds that the defendant has not fully performed its contract, but that the delays that have occurred in the performance of the contract are reasonable delays, and they are such delays as could be, and were, anticipated by the plaintiff.

"The court finds that the defendant has expended considerable sums of money in the performance of their contract and that the defendant has not unreasonably delayed the performance of the contract."

Research refers to the writing as an "agreement" and as a "contract," and states the action is to cancel and rescind. Yet it also asserts throughout that the writing was only an offer, and was never accepted, and the offer was revoked and withdrawn. This apparent inconsistency might be somewhat cleared up if Research took the position that it was a written agreement or contract to enter into a contract later, but we have read in vain in its briefs for such a statement. The repetitious statement that the offer was never accepted and the discussion of the time element lead us to believe Research never intended to recognize the writing as a contract. In the body of the petition reference is made to the uncertainty respecting its character, but there is no ambiguity respecting the relief Research sought. It desired to be relieved of any relation to Barnsdall by reason thereof.

Thus, if we determine it was only an offer and the offer was never accepted, Research is entitled to judgment; but, if we determine that it amounted to a contract, binding on both parties according to its terms and tenor, Research is not entitled to judgment, and the judgment of the trial court must be affirmed.

We are of the opinion the writing is a contract in every essential. It expressly recites a consideration based upon the mutual agreements, and it is clear from its terms each of the parties assumed duties and undertook to do things that would inure to the benefit of the opposite party and result in injury or detriment to the doer. The argument that the contract is unilateral fails when the authorities are considered. A contract is unilateral when one party furnishes no consideration to the other, and does not obligate himself to do anything that may result in injury to himself or benefit to the other. Edwards v. Roberts (Tex. Civ. App.) 209 S. W. 247. In this instance

Research conferred a benefit on Barnsdall by permitting Barnsdall to undertake to test its patented process, a venture that might result in Barnsdall being entitled to use the patented process for many years on terms advantageous to Barnsdall; whereas, Barnsdall obligated itself to conduct one test, and others thereafter according to experience, that might result in loss to it, or result in gain to both parties. More is not required to constitute sufficient consideration for a contract.

All of the other elements are there. As said in A. O. Anderson v. Texas Co., 279 Fed. 76, the test for determining whether a paper is a contract is whether there is embodied in it everything which the parties have agreed to do, and that it remains executory in some of its performances or details does not detract from its character as a complete contract. "A contract may be partly executed and may be executory as to one party and executed as to the other." See also Galbreath Gas Co. v. Lindsey, 62 Okla. 84, 161 P. 826.

In this contract the parties outlined step by step what should be done, and as their progress continued the expected eventualities were carefully provided for. The first step was obligatory upon Barnsdall, and the second step depended upon the experience gained from performance of the first, and the third upon the experience gained from the performance of the second step. There does not seem to have been a single contingency overlooked, and as each step developed and as Barnsdall elected to pursue further performance from time to time there was no occasion to stop and ask, what are the terms governing me if I go further? The contract contained them all. There would be no occasion for further negotiations or agreements.

We are of the opinion the fact that the second and third steps were optional did not deprive the writing of its contractual character. It is well recognized that contracts may be valid although performance on the part of one party may be optional, or conditional or contingent. 17 C. J. S. 937, sec. 456; Contracts, Key

No. 221, Am. Dig. (West) and the authorities cited thereunder. See, also, Sam P. McCullough v. Doggett, 176 Okla. 8, 54 P. 2d 184, and Champlin Rfg. Co. v. Gasoline Prod. Co., 29 Fed. 2d 331.

Contracts to make a will in favor of an individual for services to be rendered are valid although the individual possesses the power to terminate the obligation by ceasing rendering the service. Williston on Contracts (Rev. Ed.) vol. 5, page 4025, citing Ward v. Ward (Utah) 85 P. 2d 635, and other cases.

The authorities cited by Research in support of its arguments that the writing is at most an offer or a unilateral contract wherein it was bound until Barnsdall exercised the option are of the most general character, and do not aid in the determination of the rather precise issue we are confronted with.

However, if we adopt Research's view on this point, we are of the opinion that the better-reasoned authority requires a negative answer to its assertions. In Williston on Contracts (Rev. Ed.) vol. 1, page 165, sec. 60 et seq., is discussed (1) revocation of offers for unilateral contracts, and (2) when the offers are irrevocable even though only options.

It is said to be difficult to state a theory consistent with the general law of contracts by which the power of an offeror of a unilateral contract to withdraw his offer at any time before complete performance by the offeree is denied or limited. But the courts are cognizant of the injustice that may be done the offeree if, in reliance upon the offer that requires present and prolonged performance, he undertakes performance but cannot bind the offeror by anything less than full performance. In other words, Research and Barnsdall executed the writing herein for the accomplishment of certain desired end that was hoped would result in a legal relation between the parties for a long period of time to their mutual benefit, and the performance of specified acts by Barnsdall was to serve to attain this end, and in reliance thereon Barnsdall entered upon performance. But before it could complete performance Research says, in effect, I revoke because neither of us was bound until after full performance by you. The recognition of the latent opportunities for injustice to the performer has led the courts to generally adopt rules that bind the offeror so long as the offeree indicates an intention to be bound by his pursuing complete performance.

In Williston, supra, page 166, sec. 60, et seq., it is said:

"Doubtless wherever possible, as a matter of interpretation, a court would and should interpret an offer as contemplating a bilateral rather than a unilateral contract, since in a bilateral contract both parties are protected from a period prior to the beginning of performance on either side. When courts are unable to interpret a transaction as bilateral, if the offer requests immediate performance of a substantial character, the courts then seek if possible to interpret that performance as the requested consideration and manifestation of acceptance, any further requested performance being interpreted as merely a condition of the promisor's liability on the unilateral contract formed by the major performance."

While we have construed the writing to be a bilateral contract binding upon all, we are impressed with the statement of the text that present performance may be regarded as acceptance of the offer to enter into a unilateral contract. As pointed out in the text and authorities cited, while the decisions cannot be sustained by resort to the technical law of contracts, that, nevertheless, various implications are raised or indulged with respect to the agreements and the offeror's lack of power to revoke from considerations of the detriment occasioned the offeree by withdrawal after his part performance. So, whether the writing before us is construed on the merits to be a bilateral contract, or, out of consideration of the altered position of the offeree by part performance, is construed bilateral rather than unilateral, or acceptance is to be implied from present part performance, or collateral agreement is to be implied to keep the offer open after part performance until full performance, the answer is always adverse to Re-

search, and in affirmance of the judgment. See Williston, supra, and Restatement Law Contracts, vol. 1, page 53, sec. 45, et seq.

We do not see any support in the record for Research's argument that part performance is ineffectual because of the expressed time limit for full performance. We are convinced that the references in the contract to dates are for the establishment of illustrative instances of periods of accounting practices. If it had been the intention of the parties to complete these experiments and to require Barnsdall to say "Yes" or "No" by the 31st day of December, 1937, it should have been so stated. To us, the most that can be inferred from the fixing of the dates for accounting is that the parties supposed or even hoped that something definitive would be known then. We do not believe the use of those dates will support the inference that if Barnsdall was not in a position to say "Yes" on or before that date their relations ceased and the prospects sought should be abandoned, and all that had been done became naught.

The arguments on propositions III and IV are without merit. What we have said with respect to the effect given part performance following a so-called offer suffices to hold that the allegations of the answer were sufficient and the demurrer thereto was properly overruled, and that the evidence objected to was relevant to the issue of part performance.

The judgment is affirmed.

WELCH, V. C. J., and RILEY, OSBORN, and DANNER, JJ., concur.