2005 OK CIV APP 48

**Terence T. BOURKE and Nicholas Patterson, Plaintiffs/Appellees,**

v.

**WESTERN BUSINESS PRODUCTS, INC., an Oklahoma corporation; Omar Ingram, Special Administrator of the Estate of Lester Scarbrough, Deceased; and Jack L. Roberts, Jr., Defendants/Appellants.**

**No. 98,333.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Aug. 3, 2005.

Donald E. Herrold, Jack N. Herrold, David H. Herrold, Herrold, Herrold & Co., P.C., Tulsa, OK, for Appellants Western Business Products, Inc., and Omar Ingram, Special Administrator of the Estate of Lester Scarbrough, Deceased.

David A. Tracy, Naylor, Williams & Tracy, Inc., Tulsa, OK, for Appellant Jack L. Roberts, Jr.

Robert P. Skeith, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, OK, and David Bryant, Diamond, McCarthy, Taylor, Finley, Bryant & Lee, L.L.P., Dallas, Texas, for Appellees.

Opinion by LARRY JOPLIN, Presiding Judge.

¶1 Defendants/Appellants Western Business Products, Inc., an Oklahoma corporation (WBP), Omar Ingram, Special Administrator of the Estate of Lester Scarbrough, Deceased (Scarbrough), and Jack L. Roberts, Jr. (Roberts, or collectively, Defendants), seek review of the trial court's orders denying their motions for new trial/judgment *non obstante verdicto*/remittitur after entry of a

judgment on a jury's verdict for Plaintiffs/Appellees Terence T. Bourke and Nicholas Patterson (individually, by name, or collectively, Plaintiffs), on Plaintiffs' claims to recover damages for alleged anticipatory repudiation, fraud, and breach of an implied employment contract. In this appeal, Defendants complain the trial court erred in improperly instructing the jury and submitting Plaintiffs' claims to the jury for determination.

¶ 2 WBP was organized as an Oklahoma corporation in 1981 to sell and service office equipment. Scarbrough and Roberts acquired all shares of WBP stock in 1983. Scarbrough owned fifty-one percent (51%) of the stock, and Roberts owned forty-nine percent (49%). In 1995, WBP hired Bourke as sales manager and Patterson as a salesperson.

¶ 3 In 1999, with Western's sales on the rise,[1] Scarbrough, Roberts, WBP, Bourke and Patterson executed a "Stock Purchase Agreement" (SPA) by which Scarbrough agreed to sell, and Roberts, Bourke and Patterson agreed to buy, all Scarbrough's WBP stock "[i]n the event of [his] death, retirement or should he become disabled."[2] Particularly, the SPA specified that, contingent on their continued employment with WBP at the time of a triggering event,[3] Roberts was obligated to purchase 240 shares, Bourke, 1,200 shares, and Patterson, 600 shares.[4] The SPA also specified the manner of the valuation of the stock, and payment of the purchase price in 120 monthly installments to be deducted from their respective salaries.

¶ 4 In October 2000, Scarbrough announced his intent to retire and offered Bourke six months salary if he would "move-on." Bourke declined, but offered to buy *all* of Scarbrough's WBP stock. Scarbrough told Bourke that he would not sell all of his stock to him, but that Bourke could buy both his and Robert's stock for one lump sum payable immediately to become the sole owner, subject to a first-right-of-refusal by Roberts.

¶ 5 At that time, Roberts began investigating sources to finance purchase of the WBP stock. When it appeared that Roberts may have obtained the necessary financing, Plaintiffs demanded that Scarbrough sell them his stock according to the terms of the SPA, but Scarbrough refused, stating that he could tear up the agreement anytime he wanted.

¶ 6 Plaintiffs then commenced the instant action, seeking actual and punitive damages under the theories of anticipatory repudiation and fraud. Scarbrough fired Plaintiffs. Plaintiffs amended their Petition, adding a claim for breach of an implied employment agreement created by the SPA.[5] Scarbrough and WBP denied liability under the SPA, arguing that (1) because Scarbrough had not yet died, retired or become disabled, Plaintiffs had no rights under the SPA, and suit was premature; and (2) the doctrine of anticipatory repudiation did not apply to the SPA, a unilateral contract. Roberts contended that he had no duty under the SPA to sell stock to Plaintiffs, so he could not be held liable for any breach of the SPA due to failure to sell stock to them. All the Defendants denied any fraudulent acts, and WBP denied the existence of any implied employment agreement under the SPA.

1. Although Western's annual sales initially dropped the first year after the hiring of Bourke and Patterson, Western's annual sales eventually grew from slightly more than $3 million in 1999 to over $5 million in 2000.

2. The SPA defined "disabled" to "mean physical or mental incapacity preventing ... Scarbrough, for a period of three (3) consecutive months, from personally exercising his rights as a Stockholder or fulfilling his duties as an officer, director or employee of the Company."

3. "The obligation ... to purchase ... Scarbrough's shares of stock shall terminate or be void if the employee is no longer an employee of

[WBP] upon the date of ... Scarbrough's retirement, effective date of disability or date of death."

4. Upon performance of the SPA, Roberts would ultimately own a controlling 55% of the shares, Bourke 30% and Patterson 15%.

5. Under this theory, Plaintiffs argued that the SPA, permitting payment for the stock in installments deducted from their WBP pay over a ten year period, created an implied employment agreement.

¶ 7 At trial, Plaintiffs adduced testimony argued to show that Scarbrough always intended to sell all his stock to Roberts, and never intended to honor the SPA, i.e., that he used the SPA only to induce the continued hard work of Bourke and Patterson with no intent to perform. Plaintiffs also adduced evidence that Scarbrough would be paid $1.3 million in cash if he sold to Roberts, but less than $1 million in installments if he sold to Plaintiffs. Plaintiffs further presented evidence that Scarbrough was in ill health, that he had announced his retirement in October 2000, and that since, he had not devoted any substantial time to the management and operation of Western. Plaintiffs further argued that the SPA, specifying their payment for the stock in 120 monthly installments, created a implied contract of employment. At the conclusion of Plaintiffs' case, Defendants interposed a demurrer to the evidence, which the trial court overruled.

¶ 8 Defendants presented evidence that Scarbrough had not retired or become disabled as to trigger the buy/sell provisions of the SPA, and that prior to commencement of suit, Scarbrough "retracted" the alleged "repudiation" of the SPA. Defendants also presented evidence that Roberts' quest for financing was discussed at weekly sales meetings with all parties present; but, that Roberts never applied for or obtained financing for the purchase of Scarbrough's stock; and Roberts testified that, even if he had purchased Scarbrough's stock, he had intended to honor the SPA and sell the designated shares to Plaintiffs. At the conclusion of Defendants' evidence, Defendants moved for directed verdict, which the trial court denied.

¶ 9 The trial court then instructed the jury on fraud, anticipatory repudiation and breach of implied employment contract. Upon consideration of the evidence, the jury returned verdicts for Plaintiffs, and the trial court entered judgment accordingly.[6] Defendants then filed motions for new trial, judgment notwithstanding the verdicts, and remittitur, which the trial court denied.

### I. Anticipatory Repudiation

¶ 10 In three propositions, Scarbrough and WBP contend the doctrine of anticipatory repudiation does not apply in this case because the SPA was a unilateral executory contract, and the obligation to sell did not arise until his death, disability or retirement. So, says Scarbrough, because the evidence clearly did not show his death, disability or retirement as to trigger his obligation to sell, Plaintiffs could not recover under the theory of anticipatory repudiation. Roberts agrees, and asserts that he had no individual obligation to sell stock under the SPA.

¶ 11 " 'A contract is unilateral when one party who makes a promise has received a consideration other than a promise to make the contract binding[,] [and] [a] unilateral contract is . . . defined as one in which there is a promise on one side only, the consideration therefor being an Act[;] . . . After the act upon which the promise is based is performed, a valid contract comes into existence.' " *Edwards v. Petross*, 1963 OK 114, ¶ 0(1), 381 P.2d 1008, 1009. *See also, Langdon v. Saga Corp.*, 1976 OK CIV APP 65, ¶ 6, 569 P.2d 524, 527.[7] A bilateral contract embodies the mutual and interdependent obligations between the parties, and the parties' exchange of promises of performance constitutes good and valid consideration to support

---

6. The judgment on jury verdict reflects the following awards:

| For Bourke and Against | Scarbrough | Roberts | WBP |
| --- | --- | --- | --- |
| Actual Damages | $435,000 | $435,000 | $450,000 |
| Punitive Damages | $100,000 | $200,000 | $ 35,000 |

| For Patterson and Against | Scarbrough | Roberts | WBP |
| --- | --- | --- | --- |
| Actual Damages | $315,000 | $315,000 | $280,000 |
| Punitive Damages | $ 50,000 | $100,000 | $ 15,000 |

7. "Unilateral contracts contemplate an offer which is accepted by performance rather than a promise of performance."

the formation of an enforceable contract. *See, e.g., Tucker v. Zachary,* 1954 OK 105, ¶¶ 0(3), 23, 269 P.2d 773, 777.[8] A contract is "executory" when one party promises to perform at some time in the future. *See, e.g., Galbreath Gas Co. v. Lindsey,* 1916 OK 802, ¶ 0(1), 161 P. 826.[9]

■■ ¶ 12 The doctrine of anticipatory repudiation applies to a bilateral, executory contract, and a party who makes a distinct, unequivocal, and absolute declaration of an intent not to perform may be held liable for breach of the contract. *See, e.g., Bushey v. Dale,* 1937 OK 716, ¶¶ 0(3), 7, 75 P.2d 193, 196. So, where a party to a bilateral contract repudiates the contractual obligation to perform a required act in the future, the other party to the contract may treat the contract as then breached and immediately pursue a remedy for breach of the contract. *Teeter v. Mid–West Enterprise Co.,* 1935 OK 1174, ¶ 5, 52 P.2d 810, 812; *Consolidated Pipe Line Co. v. British AMOCO,* 1933 OK 221, ¶ 27, 21 P.2d 762, 768.

■■■ ¶ 13 The doctrine of anticipatory repudiation may not apply to a unilateral contract. A unilateral offer, dependent upon fulfillment of a condition precedent, becomes binding once the condition precedent is fulfilled. *See, e.g., Worms v. Burgess,* 1980 OK CIV APP 1, ¶ 13, 620 P.2d 455, 458. So, where the obligations of a unilateral contract depend upon the occurrence of some future event, the unilateral contract cannot be enforced unless or until the future event in fact occurs. *See, Rollins v. Rayhill,* 1948 OK 83, ¶ § 14–16, 200 Okla. 192, 191 P.2d 934, 937–938; *Sam P. McCullough, Inc. v. Doggett,* 1936 OK 131, ¶ 0(4), 54 P.2d 184; *Franklin v. Parks,* 1920 OK 106, ¶ 0(1), (4), (6), (7), 188 P. 334.

■■ ¶ 14 However, a unilateral contract may ripen into an enforceable bilateral contract upon partial performance. A unilat-

eral contract arising from a long term relationship, containing an offer of a mutually beneficial result, ripens into a bilateral contract when a party acts in reliance on the contract to attain the desired result. *Petroleum Research Corp. v. Barnsdall Ref. Corp.,* 1940 OK 338, ¶¶ 17–19, 105 P.2d 1047, 1051. This is so because partial performance in reliance on the promise of some future act by the other party is construed as acceptance of the unilateral offer and "closes the contract, [so that] ordinarily nothing further is required to make the obligation effective." *Davenport v. Doyle Petroleum Corp.,* 1942 OK 132, ¶ 19, 126 P.2d 57, 60.

■■ ¶ 15 Consequently, "[a] person who binds himself, upon lawful conditions, to perform an act in the future, for the benefit of another, upon the happening of a certain condition, cannot escape the responsibility to perform the act by declaring a wrongful rescission of the contract on his part before the happening of the condition. ....″ *American Ins. Union v. Woodard,* 1926 OK 546, ¶ 3, 247 P. 398. In such a case, a claim for anticipatory repudiation will lie:

> [T]echnically and strictly speaking, there can be no breach of contract until the time for performance has arrived[.] [Y]et, if before that time arrives the promisor expressly renounces the contract and declares his intention not to perform it, the promisee may ... treat this as a breach, and may at once bring an action for damages; that is, positive notice of an intended breach of a contract to be performed in the future may be treated as an actual breach.

*Roxana Petroleum Co. of Oklahoma v. Rice,* 1924 OK 1042, ¶ 5, 235 P. 502, 505. And, upon the anticipatory repudiation of a contractual duty, further performance under the contract is excused: "It is a well-established rule that the declaration on the part of one party to a bilateral, executory contract, of his

---

8. " 'Where mutual promises are made, the one furnishes a sufficient consideration to support an action on the other.' "

9. "Where two parties enter into a written contract by the terms of which an easement in real estate is granted by the first party for a term of years, in consideration of certain things to be performed by the second party during said term

of years, upon the execution of the contract, if the same is free from fraud, in its execution it becomes an executed contract, and the consideration a paid consideration, so far as the first party is concerned, and the contract becomes an executory contract as to the second party, and is binding upon said second party."

intention not to perform it, thus making the other party's tender of performance futile, relieves the latter of the necessity of making the idle gesture of a formal tender" of performance. *Bushey,* 1937 OK 716, ¶ 8, 75 P.2d at 196. Furthermore, "[w]here a party's repudiation contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." Restatement of Laws, Second, Contracts 2d, § 255.[10]

¶ 16 Defendants contend the trial court erred in giving Jury Instruction No. 49 on anticipatory repudiation, and particularly, excusing Plaintiffs from presenting proof of the occurrence of one of the condition precedent events triggering Scarbrough's obligation to sell, i.e., his death, disability or retirement.[11] Plaintiffs aver that Defendants failed to specifically object to the instruction below, and hence, failed to preserve for appellate review their objections to that instruction except for fundamental error only. Defendants respond, arguing they preserved the issue for review by requesting Oklahoma Uniform Jury Instructions be given.

■■■ ¶ 17 In order to preserve the trial court's judgment concerning jury instructions for appellate review, Oklahoma law requires the contemporaneous objection to the jury instructions at trial. 12 O.S. § 578. Where the issue is properly preserved, we will not reverse for error in those instructions unless it appears reasonably certain that the jury was misled by them. *Juvenal By and Through Juvenal v. Okeene Public Schools,* 1994 OK 83, ¶ 13, 878 P.2d 1026,

1030. However, "[w]hen the error is a matter of the instruction given the jury and the record has not been properly preserved, 'the review will be confined to prejudicial error, erroneous statement of fundamental law, appearing upon the face of the instructions.'" *Sullivan v. Forty–Second West Corp.,* 1998 OK 48, ¶¶ 5, 9, 961 P.2d 801, 802, 803. (Citations omitted.) "The best guide to determine if a party was prejudiced by erroneous instructions is to look at whether the verdict is supported by competent evidence[,] [and] [i]f competent evidence supports the verdict, we will not disturb it because of erroneous instructions *'unless it appears reasonably certain that the jury was misled.'"* *Juvenal,* 1994 OK 83, ¶¶ 12–13, 878 P.2d at 1030. (Emphasis original.) (Citations omitted.)

■■■ ¶ 18 Scarbrough failed to object to Instruction No. 49 by number and WBP voiced approval of Instruction No. 49. Defendants only requested the trial court give "the following jury instructions taken from the Oklahoma Uniform Jury Instructions ... Chapter 23: 23.1 to 23.56," but did not specifically request a particular instruction on excuse of conditions.[12] However, we need not reach the issue of whether Defendants' general request for OUJI instructions was sufficient to preserve the asserted objection, because we have reviewed the instructions, and find the instructions as a whole correctly state the law and did not mislead the jury.

¶ 19 In this respect, we have recognized Oklahoma precedent holding that, upon Scarbrough's repudiation of the contract, Plaintiffs were excused from further per-

---

10. *See also,* Restatement of Laws, Second, Contracts 2d, § 255, comment (a) ("This Section accords the same effect to a repudiation that § 245 accords to a breach by non-performance. No one should be required to do a useless act, and if, because of a party's repudiation, it appears that the occurrence of a condition of a duty would not be followed by performance of the duty, the non-occurrence of the condition is generally excused....")

11. Over Defendants' objection, the trial court instructed the jury:

Instruction No. 49
A party to a contract may not by his deliberate act prevent the happening of a condition therein and then take advantage of the condi-

tion to defeat liability on the contract. Anticipatory repudiation therefore renders proof of the performance of conditions immaterial and unnecessary. Where a party's repudiation contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.

12. "Even though a contract may call for a condition to be satisfied before a party's performance is required, in some cases the condition may be excused so that the party's performance is required even though the condition has not been satisfied. In this case, [Plaintiff] claims that the condition in the contract that [state the terms of the condition that is in issue] was excused because [state the basis of the excuse]." OUJI–CIV 23.24.

formance of their contractual duties. *Bushey*, 1937 OK 716, ¶ 8, 75 P.2d at 196. We have also recognized that, under § 255 of the Restatement of Contracts, 2d, Scarbrough's repudiation of the SPA excused the non-occurrence of one of the conditions triggering his obligation to sell. Instruction No. 49 permitted the jury to find for Plaintiffs in spite of the non-occurrence of one of the triggering events under the SPA. We find no error in instruction of the jury as alleged.

■ ¶ 20 The SPA imposed reciprocal obligations for a mutually beneficial stock sale transaction.[13] Plaintiffs were "expected by the Company to continue to contribute substantially to the Company's financial success," and to "ally" their interests with those of the Company "in a proprietary way," but Plaintiffs' "obligation . . . to purchase . . . Scarbrough's shares of stock . . . terminate[d] . . . if the employee [was] no longer an employee of [WBP] upon the date of . . . Scarbrough's retirement, effective date of disability or date of death." Plaintiffs continued to work for Defendants after the signing of the SPA until they were terminated after the alleged repudiation.

¶ 21 The evidence of Plaintiffs' continued employment for WBP, based on their reliance on Scarbrough's promise to perform under the SPA, is competent to demonstrate Plaintiffs' partial performance. Under the authorities we have recognized, and in accord with the jury instructions, the jury might well have concluded that Plaintiffs' partial performance gave rise to an enforceable bilateral contract for the transfer of WBP stock pursuant to the SPA, even if the SPA initially constituted only a unilateral offer.

■ ¶ 22 There was also extensive testimony concerning the degree of Scarbrough's involvement in the management and opera-

tion of WBP. Plaintiffs adduced evidence that Scarbrough announced his intent to retire. Plaintiffs also adduced evidence that Scarbrough only worked a few hours a day and spent his afternoons drinking to intoxication over an extended time period, although Defendants disputed whether Scarbrough's actions rose to the level of a "disability" or "retirement" under the terms of the SPA.

■ ¶ 23 Lastly, there is clearly evidence that Scarbrough repudiated his obligation to sell under the SPA. Scarbrough admitted that after Bourke approached him to buy all of his stock, he clearly and unequivocally informed Plaintiffs that he was planning to sell all of his stock to Roberts, subject to offers to sell Plaintiffs a fraction of the stock to which they were entitled under the SPA. Scarbrough also admitted he told Plaintiffs when they asked for affirmation of the SPA that he could tear the agreement up if he wanted.

¶ 24 On the evidence, we believe the jury might also have justifiably concluded that Scarbrough had in fact retired or become disabled as to give rise to his obligation to sell his WBP stock to Plaintiffs, and that Scarbrough indeed repudiated his SPA obligation to sell Plaintiffs his stock. We hold the trial court properly instructed the jury on anticipatory repudiation, and find competent evidence to support the jury's verdict for Plaintiffs' and against Scarbrough for anticipatory repudiation of the SPA.[14]

¶ 25 We likewise find competent evidence to support the verdict against WBP. The SPA obligated WBP to finance Plaintiffs' stock purchases over a ten year period. Scarbrough was the CEO and majority stockholder of WBP. The jury was instructed regarding the ability of corporate officers to

---

13. The SPA provides:

> In the event of Lester Scarbrough's death, retirement or should he become disabled . . . Lester Scarbrough, or the Trustee . . . shall sell his share of the Company stock to the below designated employee . . .
> . . . the employee has the obligation to purchase the stock on the terms and conditions aforesaid . . .
> . . . The purchasing employee shall pay . . . their respective percentage of the purchase price of his stock in equal monthly installments over a ten (10) year period . . .
> The Company shall increase each employee's salary sufficient to pay and satisfy each employees monthly payment . . .

14. In this respect, Scarbrough and WBP filed a motion to strike deposition not designated, but improperly included in the record on appeal. The motion is granted, and no part of that deposition has been considered in rendering this decision.

bind the corporation to liability, and Defendants do not take issue with those instructions. As instructed, a finding that Scarbrough repudiated the contract supports a finding that WBP, through Scarbrough, repudiated the contract.

¶ 26 However, the SPA imposed no obligation on Roberts to sell his shares to Plaintiffs. Roberts acquired none of Scarbrough's stock so as to give rise to any obligation he might have had under the SPA to convey such stock to Plaintiffs.

¶ 27 While there is competent evidence to support the jury verdict for Plaintiffs and against Scarbrough and WBP for anticipatory repudiation of the SPA, we discern no competent evidence to support a verdict against Roberts for anticipatory repudiation of the SPA. The judgment on the jury verdict for Plaintiffs and against Scarbrough and WBP for anticipatory repudiation of the SPA should be affirmed. The judgment on the jury verdict for Plaintiffs and against Roberts for anticipatory repudiation of the SPA should be reversed.

## II. Fraud

¶ 28 Defendants also contend that, because Plaintiffs had no enforceable tort or contract claim based on the SPA prior to Scarbrough's retirement, disability or death, Plaintiffs' fraud claim must fail as a matter of law. Plaintiffs assert that, irrespective of the "maturity" of their claim for anticipatory repudiation of the SPA, they presented evidence supporting a conclusion that Scarbrough and Roberts had no intention to perform the obligations of the SPA at the time of its execution, constituting actionable fraud.

¶ 29 Actionable fraud consists of (1) a false misrepresentation of material fact, (2) made as a positive assertion which is either known to be false, or made recklessly without knowledge of the truth, (3) with the intention that it be acted upon, and (4) which is relied on by the other party to his/her own detriment. *See, e.g., Rogers v. Meiser,* 2003 OK 6, ¶ 17, 68 P.3d 967, 976. A fraud claim

may arise "where the promise to act in the future is accompanied by an intention not to perform and the promise is made with the intent to deceive the promisee into acting where he otherwise would not have done so[:] [t]he gist of the rule is not the breach of promise but the fraudulent intent of the promisor at the time the pledge is made not to perform the promise so made and thereby deceive the promisee." *Citation Co. Realtors, Inc. v. Lyon,* 1980 OK 68, ¶ 8, 610 P.2d 788, 790.

¶ 30 Plaintiffs adduced evidence that Scarbrough and Roberts intended for them to rely upon the SPA. Plaintiff Patterson testified that he turned down other job offers in reliance on the SPA. There is competent evidence of Plaintiffs' reliance on the SPA.

¶ 31 Plaintiffs contend the proof of Scarbrough's subsequent repudiation of the SPA evinces his intent not to perform *ab initio.* However, and viewed in the light most favorable to Plaintiffs, this evidence at best supports *only* an *inference* of misrepresentation in the creation of the SPA.

¶ 32 Defendants, on the other hand, presented evidence that Scarbrough drafted the agreement to assure him and his heirs of guaranteed income for 10 years after he left WBP, that he prepared several drafts of the agreement, and that he went to the expense of hiring counsel to draft and finalize the SPA.

¶ 33 "[T]he law presumes honesty and fair dealing, and fraud may not be inferred from acts which are consistent with honesty of purpose." *Madill Bank and Trust Co. v. Herrmann,* 1987 OK CIV APP 4, ¶ 11, 738 P.2d 567, 571; *Mohoma Oil Co. v. Ambassador Oil Corp.,* 1970 OK 161, 474 P.2d 950, 958.[15] "When a transaction is fairly susceptible of two constructions, the one which will free it from the imputation of fraud will be adopted." *Funnell v. Jones,* 1985 OK 73, ¶ 17, 737 P.2d 105, 108. Fraud is never presumed and each of the elements must be proved by clear and convincing evi-

**15.** "Fraud is never presumed, but it must be affirmatively alleged and proven by the party who relies upon it, and cannot be inferred from

facts which may be consistent with honesty of purpose."

dence. *Funnell*, 1985 OK 73, ¶ 14, 737 P.2d at 108.

¶ 34 The evidence of Defendants' intent to perform was conflicting, but, is consistent with an honest purpose. Plaintiff's evidence supports *only* an *inference* of misrepresentation in the creation of the SPA, and is insufficient to support the fraud claim.

¶ 35 Plaintiffs also adduced evidence of an undisclosed agreement between Scarbrough and Roberts that Roberts would be "lead man" and majority stockholder at WBP after Scarbrough's departure, but the SPA clearly provided for Roberts' ownership of a majority of WBP stock. The non-disclosure of some agreement between Scarbrough and Roberts for Roberts' majority stock ownership cannot constitute a material misrepresentation and the basis of a fraud claim where the SPA clearly so provides.

¶ 36 Furthermore, there is no clear and convincing evidence to support a conclusion that Roberts made any material misrepresentation to Plaintiffs regarding the SPA. Indeed, the evidence suggests that Roberts made no secret of his efforts to obtain financing to purchase Scarbrough's stock, and had every intention of honoring the SPA obligation to sell shares to Plaintiffs.

¶ 37 We find no clear and convincing evidence of Defendants' fraud to support the jury verdict. The judgment on the jury verdict for Plaintiffs and against Defendants for fraud should be reversed.

### III. Breach of Implied Employment Contract

¶ 38 Defendant WBP asserts Plaintiffs' failure to adduce sufficient evidence to support a finding of the existence of an implied employment contract under the SPA. Plaintiffs assert the SPA provisions for payment of the stock purchase price in monthly installments deducted from their employment pay for 10 years created an implied contract for their continued employment for the duration of the 10-year payout period, and that the jury was justified in so concluding.

¶ 39 The courts consider various factors when determining whether an implied employment contract exists:

When determining whether an implied contract exists, the Court will consider (a) the parties' acts, conduct and statements as a whole, (b) whether there was a meeting of the minds on the agreement's essential elements, (c) the parties' intent to enter into a contract upon defined terms, and (d) whether one of the parties has relied in good faith upon the alleged contract. [However,] . . . the law will not make for a party a better contract than it made itself or alter an agreement for one party's benefit and another's detriment. [A]n implied contract encompasses all provisions—discernible from the circumstances under which the agreement was reached—which are indispensable to effectuate the parties' intentions.

*Dixon v. Bhuiyan*, 2000 OK 56, ¶ 10, 10 P.3d 888, 891. An implied contract "is deduced from disclosed circumstances as well as the parties' relations and its terms reflect the agreement which in fairness ought to have been made." *Dixon*, 2000 OK 56, ¶ 11, 10 P.3d at 891.

¶ 40 So, vague assurances of continued employment will not support a finding of an implied employment agreement. *Hayes v. Eateries, Inc.*, 1995 OK 108, ¶ 9, 905 P.2d 778, 783. "[I]n order to create an implied contract the promises must be definite[:] Only when the promises are definite and, thus, of the sort which may be reasonably or justifiably relied on by the employee, will a contract claim be viable." *Id.*

¶ 41 In this case, Plaintiffs based their claim of an implied employment contract on the SPA, not just on oral, vague assurances. The parties adduced testimony and evidence concerning their acts, conduct, statements, mutual intent and expectations of Plaintiffs' continued employment after signing the SPA, and the parties' reliance on that aspect of the SPA.

¶ 42 Indeed, the SPA recognized that Plaintiffs were valued employees, and expressly or implicitly evinced the parties' mutual and reciprocal intent to work together in harmony and without interruption before and after the stock sale. The expectation of

Plaintiffs' continued employment arose the day the parties executed the SPA, as the SPA rewarded Plaintiffs for their contributions to the company with an opportunity to purchase an interest in the company, contingent only upon their continued employment with the company at the time of a triggering event. The provision for payment of the stock purchase price by monthly deduction from Plaintiffs' employment pay clearly, it seems to us, anticipated that Plaintiffs would continue to work at WBP at least long enough to pay for the stock.

¶43 The provisions of the SPA for Plaintiffs' purchase of Scarbrough's stock by monthly payroll deduction could be reasonably interpreted as definite promises of their continued employment. We conclude the trial court properly submitted the issue of the existence of an implied employment agreement to the jury, and we find competent evidence to support a finding of both existence and breach of such an agreement.

## IV. Conclusion

¶44 The order of the trial court granting judgment on the jury's verdict for Plaintiffs and against Defendants Scarbrough and WBP for anticipatory repudiation is AFFIRMED. The order of the trial court granting judgment on the jury's verdict for Plaintiffs and against Defendant WBP for breach of an implied employment contract is AFFIRMED. The order of the trial court granting judgment on the jury's verdict for Plaintiffs and against Defendant Roberts for anticipatory repudiation is REVERSED. The order of the trial court granting judgment on the jury's verdict for Plaintiffs and against Defendants Scarbrough, Roberts and WBP for fraud is REVERSED, and the award of punitive damages is accordingly vacated. The request of Scarbrough and WBP for an award of attorney's fees is denied.

HANSEN, J., concurs in result;
BUETTNER, C.J., concurs.